**EL PASO NATURAL GAS COMPANY, Appellant,**

v.

**AMERICAN PETROFINA COMPANY OF TEXAS, et al., Appellees.**

No. 01–84–0350–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 7, 1986.

Rehearing Denied Dec. 30, 1986.

Robert J. King, Gary C. Conine, D. Mitchell McFarland, Patricia L. Jones, Liddell, Sapp & Zivley, Houston, Donald J. MacIver, Jr., Arthur R. Formanek, El Paso Natural Gas Co., El Paso, Rush Moody, Jr., Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for appellant.

R. Gordon Gooch, Charles M. Darling, IV, Diana E. Marshall, Steven R. Hunsicker, John W. Leslie, Dennis J. Moss, Baker & Botts, Washington, D.C. and Houston, James V. Hammett, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Houston, David T. Harvin, Vinson & Elkins, Houston, J.O. Terrell Couch, Hutcheson & Grundy, Houston, for appellees.

Before WARREN and SAM BASS, JJ., and BERT TUNKS, Retired Justice.

## OPINION

BERT TUNKS, Retired Justice.

El Paso Natural Gas Company is, and has been for many years, a major interstate natural gas pipeline. As such, it owns and operates about 9,500 gas producing wells. Its gas delivery system consists of 21,000 miles of pipeline and necessary facilities connected therewith. Three thousand two hundred of its gas wells are on property located in the San Juan Basin in New Mexico and are the subjects of the assignments the validity and construction of which are involved in this case. It was the plaintiff in the trial court and is the appellant here. It will sometimes be referred to in this opinion as El Paso or appellant.

In the early 1950's there was a growing demand from potential gas users on the west coast of the United States, particularly in California. El Paso, in response to that demand, sought to increase its source of supply of natural gas. Its attention was directed to an area in northwestern New Mexico known as the San Juan Basin. Much of the area within that basin had already been leased, but the holders of the leases were hesitant to develop the field fully because of the expense of doing so.

Delhi Oil Company, controlled by Mr. Clint Murchison, was the holder of leases covering more than 100,000 acres of the basin. Mr. Paul Kayser, president of El Paso, approached Mr. Murchison in 1951 to negotiate a deal whereby El Paso could acquire the gas to be produced from the Delhi leases. The culmination of those negotiations was the execution of a written agreement called a Gas Lease-Sales Agreement (GLA 47). By GLA 47, Delhi agreed to sell its leasehold interests in the San Juan Basin to El Paso. The consideration El Paso agreed to pay to Delhi was an overriding royalty interest in the assigned leases. The overriding royalty interest was expressed as a specific sum of money per thousand cubic feet (Mcf) of gas produced from the leases. The amount of the override began at 5.5 cents per Mcf and increased at an agreed rate for the next 12 years, at which time the parties would either agree upon a new rate or would submit the matter to arbitration. The maximum rate to which the fixed royalty increased during the primary term that was provided was 10 cents per Mcf.

In addition to the overriding royalty to be paid in cash, GLA 47 provided that the assignor should get ⅓ of the liquid produced along with gas produced from the leases. The assignor was given the choice as to taking these liquids in kind or being paid in their cash value.

El Paso continued its search for new sources of gas after its acquisition of the Delhi leases. By that search, it acquired other leases from other lessees in the San Juan Basin. Those other leases were assigned to it by GLA's substantially in the form of GLA 47. (The minor differences will be discussed hereafter.) This case involves the construction of GLA 47 and 12 other GLA's pursuant to which El Paso was assigned the rights to leases in the San Juan Basin.

In 1938, before the facts giving rise to this controversy occurred, Congress enacted the Natural Gas Act (NGA). Ch. 556, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. secs. 717–717z (1982)). By that Act, the interstate production, distribution, and sale of natural gas was federally controlled. That Act was administered by the Federal Power Commission (FPC). A basic purpose of the NGA was to limit the rate at which natural gas could be sold in interstate commerce to a "just and reasonable" rate. The determination of whether a proposed rate was "just and reasonable" was made by the FPC. In making that determination, the cost of service incurred by the proposed seller was a basic factor.

El Paso, itself, was the producer of some of the gas that it distributed through its pipeline system and sold to users. Thus El Paso was, as to part of its gas, both a producer and a pipeline. Much of the gas acquired by pipelines generally for sale to users is produced by independent producers and sold to the pipelines. The price at which such gas was bought by the pipelines, if a "prudent" price, was a factor in determining the pipeline's "cost of service," which, in turn, was a factor in determining whether its proposed rate was "just and reasonable." As to a pipeline that produces the gas that it distributes and sells, rather than buys it from an independent producer, there was no purchase price to use in calculating its cost of service. Instead, the pipeline's cost of producing the gas, determined in accordance with accounting principles, was used.

In 1978, Congress enacted the Natural Gas Policy Act (NGPA), Pub.L. No. 95–621, 92 Stat. 3350 (codified at 15 U.S.C. secs. 3301–3432 (1982)). That Act fixed the maximum lawful prices at which gas could be sold in a "first sale." It established eight different categories of gas production and fixed a maximum lawful price for first

sales in each category. It also prescribed a formula for increasing first sale prices each month and passing the cost on to downstream purchasers. This was used for the purpose of adjusting for inflation.

The NGA provided federal control for only interstate gas pipelines and left intrastate regulation, if any, to the states. The NGPA did not repeal the NGA, but did extend federal regulation so as to apply to both interstate and intrastate gas pipeline operations. The NGPA also changed the name of the regulatory agency from the Federal Power Commission to the Federal Energy Regulatory Commission (FERC).

The U.S. Supreme Court in *Public Service Commission v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668, decided on June 28, 1983, held that the maximum lawful prices fixed in the NGPA applied to intracorporate transfers from the production department of a pipeline to the distribution department and fixed the amount which could be passed through by the pipeline to its customers as its cost of acquisition. (This case is commonly called *"Mid-La"* and will be called by that name herein.)

A significant matter of which notice should be taken in recitation of the background of this case is the arbitration in 1973 after the primary term provided in GLA 61, during which the overriding royalty was fixed in cents per Mcf and ⅛ of the liquid produced, expired. Sun Oil Company was the assignor in that GLA and the owner of the overriding royalty incident thereto. Upon the expiration of the primary term, Sun and El Paso undertook to agree on the overriding royalty to be applicable thereafter, but were unable to do so. Whereupon, the matter was, as provided in GLA 61, submitted to arbitration. The arbitration board fixed the amount of the overriding royalty to be paid by El Paso to Sun at 40 cents per Mcf—four times the highest overriding royalty El Paso had been required to pay during the primary term. The amount of the override so fixed by the arbitration board exceeded the allowable rate for flowing gas of similar vintage established by the FPC pursuant to the NGA.

All of the GLA's involved herein have a "favored nations clause." That clause obliges El Paso to pay each overriding royalty owner a royalty equal to the highest royalty it pays to any other overriding royalty owner. After the Sun arbitration, the other overriding royalty owners took the position that the award of the arbitration board in the Sun matter triggered the favored nations clause of the GLA's under which they held.

After the arbitration board's award in the Sun matter, El Paso filed suit in federal district court seeking a declaratory judgment that the royalty owners were sellers of gas in interstate commerce and that, therefore, the amount of the overriding royalty they could collect was subject to federal price ceilings. El Paso also filed a complaint with the FPC seeking an order consistent with its claim in the district court.

In 1977, the United States District Court, sitting at Midland, Texas, held that the GLA's were not sales of gas within either its jurisdiction or that of the FPC and dismissed the case. *El Paso Natural Gas Co. v. Sun Oil Co.*, 426 F.Supp. 963 (W.D.Tex. 1977). In 1980, the FERC ruled that the GLA royalty owners were sellers of gas subject to federal pricing limitations and subject to the FERC's jurisdiction. In 1983, the Fifth Circuit affirmed the district court's action and reversed the FERC's ruling. *El Paso Natural Gas Co. v. Sun Oil Co.*, 708 F.2d 1011 (5th Cir.1983). After the Sun arbitration award, and while the Sun Oil Co. case was pending, El Paso could not obtain rate relief from the FPC, because the amount of El Paso's liability had not been finally determined. To alleviate this problem, the parties entered into settlement agreements referred to as the 1974 settlement agreements. By those agreements they provided for amendment of the terms of the GLA's. As to the amount of the overriding royalty payable under the GLA's, the agreements provided that the amount should be set on June 1 of each year at an amount:

... equal to the highest rate prescribed or permitted by the Federal Power Commission (or by any successor federal agency having authority to review or establish rates for natural gas flowing in interstate commerce) for natural gas flowing in interstate commerce ... less seven (7) cents per Mcf; provided, however, that in determining such highest rate only those rates of general applicability which are prescribed or permitted with respect to sales of gas at the well-head shall be considered....

At the time this case was tried before the trial court the "highest price" that was to be used as the basis for computing the overriding royalties payable to the defendants was the price fixed by section 102 of the NGPA—that is, the maximum price at which gas produced from section 102 wells could lawfully be sold. That price was $3.42 per MMBtu, which, less .07 cents, or $3.35 per MMBtu, was the price at which the royalty payable was computed. El Paso had no section 102 wells. Almost all of its GLA wells were either section 104 or section 103 wells. The maximum price at which gas produced from section 104 wells could lawfully be sold was .85 cents per MMBtu. The maximum price at which gas produced from section 103 wells could lawfully be sold was $2.85 per MMBtu. Those facts demonstrate that El Paso paid to the defendants more in overriding royalties on gas produced from GLA wells than it could lawfully charge its customers for the gas produced from those wells. That is, the overriding royalties were more than 100% of the revenues from the GLA wells.

On August 1, 1983, El Paso gave written notice to the defendant overriding royalty owners that it was reassigning to them, as of October 1, 1983, those wells and leases which they, or their predecessors in ownership, had assigned to it. It tendered to them such written assignments. All of the defendant royalty owners refused to accept El Paso's tenders. El Paso then filed for record its tendered reassignment. Also on the same day, August 1, 1983, El Paso filed this suit. The defendants filed petitions for temporary injunctions to preserve the status quo between parties, and after hearing, the petitions were granted.

In the present case, El Paso sought a declaratory judgment, pursuant to art. 2524-1, as to its rights and duties under the various GLA's and lease assignments under which it owns leasehold rights in the San Juan Basin. El Paso also sought monetary damages. The defendants are those who own the overriding royalty rights provided by those GLA's in question, either as the original assignor or derived through the original assignor. They will herein sometimes be referred to as defendants, appellees, or as royalty owners. The defendants, in answer to El Paso's petition, denied El Paso's contentions with regard to the construction of the GLA's and pleaded a number of affirmative defenses, including limitations, settlement, res judicata, estoppel by judgment, laches, and waiver. The defendants also, by cross action, asked for a declaratory judgment construing the instruments in question in accordance with their claims. Both El Paso and the defendants sought recovery of attorney's fees. Each side asked for an injunction to enforce judgment in its favor.

The case was, by agreement, tried to the court without a jury. The trial court rendered judgment substantially in compliance with the claims of the defendants and cross-plaintiffs. Its various findings of fact and conclusions of law on which that judgment was based will be discussed hereafter. It granted defendants' prayer for injunction to enforce the judgment and awarded to defendants a recovery of attorney's fees of more than two million dollars. It decreed that El Paso take nothing by its suit and that defendants recover their costs of court.

There are three clauses in the GLA's around which this dispute centers. Those clauses are: (1) the unprofitability clause; (2) the undeveloped acreage clause; and (3) the 500 Mcf clause.

Most of the GLA's contained an unprofitability clause essentially in the following language:

In the event the operation of any well now or hereafter drilled shall become

unprofitable, then El Paso shall have the option upon sixty (60) days notice to [Appellee] to reassign to [Appellee] such well and the unit upon which such well is situated, and in such event, [Appellee] shall have the option to sell gas produced therefrom to El Paso at the highest price paid for gas of like kind and quality in the field by El Paso or any other bona fide pipeline company, and El Paso agrees to purchase such gas at such price.

The undeveloped acreage clause is in the following language:

In the event that development hereafter in the area of or adjacent to any drilling unit should evidence that such drilling unit will not be productive of gas in commercial quantities in the Mesaverde Formation and for such reason El Paso shall not desire to drill such well thereon, then El Paso shall promptly reassign any such drilling unit to [Appellee] or to any person whom [Appellee] may designate and thereupon shall be relieved of its obligation to drill a Mesaverde test well thereon; provided that El Paso may retain any commercial gas well completed thereon in a shallower or deeper formation, together with its rights in such drilling unit down through such shallower or deeper formation.

The 500 Mcf clause is in the following language:

It is understood that the United States Department of the Interior may not approve reservations of the overriding royalties described in paragraphs A, B, C and D above as to federal public domain unless such overriding royalties on any particular lease from which the average production per well per day is less than 500 mcf of gas are converted to a working interest. It is agreed therefore that [appellee] may in the assignments containing its reservation of such overriding royalties on federal public domain provide for the suspension of such overriding royalties when production is less than such amount; provided, however, that notwithstanding such provision, it is agreed that during any and all such periods when production on any particular lease shall be less than such amount [appellee] shall receive in lieu of such overriding royalties in such lease a portion of the working interest therein (including liquid hydrocarbons after extraction) in an amount to be agreed upon by the parties hereto, and if they cannot so agree, then in an amount to be agreed upon by a board of arbitrators in accordance with Article X hereof. El Paso agrees that in any event [appellee] shall receive such amount of working interest (including liquid hydrocarbons after extraction) in such lease so that after deduction of its part of all costs of operation from the proceeds of the sale of gas therefrom (including the liquid hydrocarbons extracted from such gas) [appellee] shall receive a net amount in cash from such working interest which shall be equal to the amount [appellee] would have been entitled to receive otherwise as overriding royalties from such lease during such period, and [appellee] agrees to sell such gas to El Paso on such basis.

The construction and application of those three controversial clauses quoted above substantially control this case. We shall discuss them in the order that they are listed.

*The Unprofitability Clause.*

The solution of the question as to the plaintiff's rights under this clause lies in the determination of whether in the computation of the costs and revenues applicable to a well, the overriding royalty that the plaintiffs must pay should be considered a cost. The defendants contend, and the trial court held, that it should not be considered a cost. We hold that the trial court's ruling in that respect was error.

The defendants, in the trial court, relied on the case of *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959), as authority for their contention. That case, in turn, cited as authority for its holding the California case of *Transport Oil Co. v. Exeter Oil Co.*, 84 Cal.App.2d 616, 191 P.2d 129 (1948). We are of the opinion that neither the *Clifton* case nor the *Transport* case is

authority supporting the trial court's holding that the overriding royalty that El Paso is required to pay its assignors under the provisions of the GLA's is not a cost to be considered in determining whether a well is unprofitable to it, as that word is used in the instrument by which the well was assigned to it and by which the overriding royalty was created.

*Clifton v. Koontz* was a case in which a lessor sued its lessee contending that the lease had terminated because it had ceased to produce oil and gas in "paying quantities." The court held that, in calculating the amount of the income attributable to the working interest, for the purpose of determining whether a well was producing in paying quantities, the lessor could not deduct overriding royalties paid by the lessee. In making this holding the court cited as authority *Transport Oil.*

In *Transport,* an assignee of a lease abandoned the lease, and its assignor, who had retained an overriding royalty interest, sued for damages it had suffered as a result. The assignee defended the suit by claiming that the lease was no longer producing in paying quantities and had, therefore, terminated by its own terms. The assignee-defendant contended that, when applying the "paying quantities" test, the court should deduct from the income from the lease not only the basic royalty payable under the terms of the lease to the lessor, but also the overriding royalties payable to prior lessees. The court held that, when determining whether the lease had terminated under its production-in-paying-quantities provision, a deduction from the income of the lease of the amount of the basic royalty payable to the lessor was proper, but that a deduction of overriding royalty was not proper. As to the landowner-lessor, the assignee-defendant had assumed the leasehold obligations and therefore occupied the same position as the original lessee. The royalty payments to the lessor were therefore deductible. However, overriding royalties, created by instruments to which the lessor was not a party, were not deductibles as costs in determining whether the lease was producing in paying quantities. The overriding royalty payment was

not an obligation *to the lessor* that the assignee of the lease assumed.

The parties recognized that a well or lease may be producing in paying quantities and yet be unprofitable to its operator. That is because, in the paying quantities test, only the basic royalty payable to the lessor is considered a cost, whereas in a "profitability" test, the overriding royalty and the basic royalty both are considered costs. This is consistent with the language of 2 H. Williams and C. Meyers, *Oil and Gas Law,* sec. 420.1 (1985) wherein it is said:

> Both the lessor and the owner of an override, suing on an implied covenant to protect against drainage, may be required to prove that an offset well, if drilled, would have been profitable. In proving profitability, the lessor would prove only that the return from production after deducting landowner royalty would have been sufficient to yield a profit to the lessee; the owner of the override would be required to deduct the override as well as the landowner royalty in determining whether an offset well would have been profitable.

*Clifton v. Koontz,* involved the application of the "paying quantities" test, which is wholly inapplicable here. If the plaintiff's right to reassign depended on its ability to show that a lease was not producing in paying quantities, then the unprofitability clause was meaningless. That is because, when the lease failed to produce in paying quantities, it automatically terminated by its own provisions in its habendum clause. There would be nothing to reassign. A basic rule in the construction of contracts is that the parties thereto are presumed to have intended its provisions to have some meaning. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). The only way to construe the unprofitability clause to have meaning is to construe it as having meant that a lease could become unprofitable even though it was still producing in paying quantities.

### The Undeveloped Acreage Clause.

The issue involved in construing the undeveloped acreage is similar to that involved in construing the unprofitability clause—what elements are to be considered as costs in determining the ability of a lease to produce in commercial quantities. The GLA's did not define the term "produce in commercial quantities," probably because the term had such an ordinary signification that its meaning is clear and unambiguous deeming a definition unnecessary. In Webster's New Collegiate Dictionary (1985) the word "commercial" is defined as, "suitable, adequate or prepared for commerce," giving as an example, "found oil in commercial quantities."

We have neither found nor been cited any case in which there is a judicial definition of the term "produce in commercial quantities." The word "commerce" connotes a venture operated for profit. A prudent oil and gas operator, in determining whether to develop theretofore undeveloped acreage, will seek to determine whether the acreage will produce in sufficient quantity that his revenues therefrom will be such amounts as will repay him his cost of development, such as, the cost of drilling and equipping a well or wells; the cost of maintaining his operator's rights, such as the royalties, basic and overriding, which he must pay; his cost of operating a well or wells; and a reasonable return on his investment incident to the development. If it will do so, the acreage will produce in commercial quantities, otherwise it will not.

■ It is significant here to note also the difference between the position of the operator, El Paso, and that of the operator, lessee, in *Clifton v. Koontz*. There the court held that the lease was producing in "paying quantities" even though it would never produce sufficiently to repay the lessee's costs of drilling the well by which the lease was developed. There the court was considering the situation after the operator had already incurred the cost of developing the lease and that cost had been irrevocably lost to him. Here, in construing the undeveloped acreage clause, we hold that the situation should be viewed prospective-

ly, before the cost of development has been incurred, and not retroactively, after that cost has been irrevocably lost.

■ We hold, as a matter of law, that the cost of the overriding royalties which El Paso was required to pay in order to maintain its status as holder of its operator's rights, was a cost necessarily to be considered in determining whether undeveloped acreage was capable of producing in commercial quantities, as applied to the facts of this case.

### The 500 Mcf Clause.

■ The language of this clause, quoted above, clearly shows that the parties to the GLA's were concerned with a regulation of the Interior Department concerning oil and gas leases of federal lands. That regulation was Section 192.83, as follows:

> Section 192.83—*Limitation of Overriding Royalties.* Any agreement to create overriding royalties or payments out of the production of any lease which, when added to overriding royalties or payments out of production previously created and to the royalty payable to the United States, aggregate in excess of 17½% percent shall be deemed a violation of the terms of the lease unless such agreement expressly provides that the obligation to pay such excess overriding royalty or payments out of production shall be suspended when the average production per well per day averaged on a monthly basis is (a) as to oil, 15 barrels and (b) as to gas, 500,000 cubic feet or less. The limitations in this section will apply separately to any zone or portion of a lease segregated for computing government royalty.

43 C.F.R. sec. 192.83 (1952–53).

In the trial court, El Paso contended that it had the right, under the 500 Mcf clause, to reassign certain wells and the units on which they were located on federal land. The trial court held contrary to El Paso's contention, holding that this clause, rather than giving El Paso the right to reassign, was a clause by which El Paso agreed to indemnify the overriding royalty owner

from any loss in the event the payment of such royalty was suspended. We affirm the trial court's holding in this respect.

The evidence showed that many of the wells on federal leases had, from time to time, for many years, fallen below 500 Mcf per day production, and neither party had taken the position that the working interest had reverted to the assignor/holder of the overriding royalty. El Paso had never before attempted to reassign them. The parties' own construction of this clause was consistent with the trial court's holding with regard thereto.

*Extent of El Paso's duty to defendants as to its marketing of gas produced from GLA wells:*

The defendants contend that the NGPA permits the plaintiff to seek and the FERC to authorize a higher price than that fixed by the NGPA for the sale of its gas. We agree with that contention.

The defendants also contend that the plaintiff, by applying for and getting from the FERC authority to abandon the cost of service method at which it sells its gas, breached an implied duty to them to seek a selling price that would preserve the GLA's profitability. The defendants argue that the implied duty was breached because, by staying on the cost of service method of pricing, El Paso could have passed through to its customers the amount of the overriding royalties it pays to the defendants.

The trial court found the relevant facts consistent with defendants' contentions and concluded as a matter of law that such breach by plaintiffs of its duty to defendants precluded it from reassigning to defendants unprofitable wells and noncommercial acreage.

We hold that in making such findings and conclusion the trial court erred.

■ The operator of an oil and/or gas lease has an implied duty to act in good faith in marketing the gas of its royalty owners when the amount of the royalty depends upon the price at which the product is marketed. *Amoco Production Co. v. First Baptist Church*, 579 S.W.2d 280 (Tex.Civ.App.—El Paso, 1979), *writ ref'd*

*n.r.e. per curiam*, 611 S.W.2d 610 (Tex. 1980). In the present case, the defendants' royalty income does not depend on the price for which El Paso sells the gas produced from the leases that the defendants assigned. It is based upon the highest amount for which El Paso could lawfully sell any gas produced from the leases. Thus, if El Paso sold gas from the GLA leases for less than the highest price authorized by the NGPA for a "first sale," it paid the overriding royalty owners the same amount as it would have paid if it had sold the gas at the highest price. We, therefore, hold that El Paso did not owe to the overriding royalty owners any implied duty as to the amount for which it sold its production.

The duty in *Amoco* to market in good faith is based on the assumption that the operator is marketing something that belongs to the royalty owners, and retaining some benefit for itself that should rightfully be included in the benefit obtained for the royalty owners. This does not support an implication that a working interest owner must market for a price sufficient to keep a lease assignment in effect when the alternative is to return 100% of the gas to the royalty owners. The existence of a contract (lease assignment) does not give rise to any implied covenant that neither party will do anything that injures the right of the other party to receive the benefits of the agreement. *English v. Fischer*, 660 S.W.2d 521, 522 (Tex.1983).

The formula by which the overriding royalties that El Paso is obliged to pay to the defendants was negotiated and agreed on in connection with the 1974 settlement agreements before the enactment of the NGPA.

We do not agree with the defendants' contention that the plaintiff owes to them the implied duty to sell its gas produced from the GLA wells for a sufficient price to prevent the wells from being unprofitable and, therefore, reassignable. If there were an implied duty to market in good faith, it did not create a fiduciary duty on El Paso by which it was obliged to subordinate its own interests to those of the defendants.

*Amoco Production Co. v. First Baptist Church*, 579 S.W.2d at 284. In *Elliott v. Davis*, 553 S.W.2d 223, 226 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.), it was said,

We conclude that the standard of good faith is correctly described in Kuntz, The Law of Oil & Gas, sec. 48.3, p. 218, as follows: Although it has been said that the lessee has a fiduciary obligation in the exercise of the pooling power, it is submitted that the lessee is not a fiduciary and that standards applied to fiduciary are entirely too strict. This is so because the lessee has not undertaken to manage and develop the property for the sole benefit of the lessor. The lessee has substantial interests that must be taken into account, and he should not be required to subordinate his own interests entirely to the interests of the lessor. Since his interests frequently conflict with those of his lessor, however, he must exercise the power in fairness and in good faith, taking into account the interests of both the lessor and lessee.

The defendants evidence no hesitation to use the provisions of the NGPA as the basis for increasing the royalties to be paid by El Paso in its production from GLA leases to more than 100% of its revenues from those leases. They can hardly be heard to say that it was unfair for El Paso to use those provisions to avoid the obligation to pay those royalties.

The defendants also contend that El Paso should have sought special relief from the FERC, increasing the price at which it could sell its GLA gas production, because its cost of service was increased by the increased overriding royalties. That amounts to saying that El Paso should have sought an order from the FERC by which the burden of its increased royalties would have been shifted to El Paso's customers, thereby keeping the GLA wells profitable and not reassignable. El Paso argues, in reply to defendants' contention that it had no duty to seek such special relief because it was unlikely that the special relief would be granted, since it had, in the unprofitability clause, a way to avoid its obligations to pay the oppressive royalties. Mr. Charles Curtis, former chairman of the FPC, a witness for El Paso, testified in support of El Paso's contention. The defendants point out that the FERC has approved the 1974 settlement agreements as being prudent. They argue that that approval shows that it would grant El Paso special relief because of the increased royalties provided in that settlement. That argument is not persuasive. At the time the settlement agreement was approved, the relationship between the plaintiff and defendants included the unprofitability clause, which we have held unambiguously gave to plaintiff the right to reassign unprofitable wells. The FERC's approval by no means justifies a conclusion that it would approve the passing through of the increased royalties to El Paso's customers.

As noted above, El Paso owns and produces gas from a number of wells other than the GLA wells. Its application to the FERC for authority to substitute NGPA pricing for its previously used cost of service pricing included, but was not limited to, its GLA wells. El Paso contends that such a substitution would result in an increase in its over-all profit from its pipeline production. The defendants not only do not contend to the contrary, but apparently confirm El Paso's contention. In the brief filed in behalf of the defendants, Tenneco, Inc., Conoco, Inc. and a number of other defendants say at page 37:

Simply stated, without regard to its royalty obligations under the GLA's, El Paso's pipeline production is far more profitable if El Paso is ultimately allowed to implement *Mid-Louisiana.*

We hold as a matter of law that El Paso had no duty to the defendants to forego its opportunity to make its "pipeline production far more profitable" by implementing *Mid-Louisiana.*

*Situation where only a fraction of the working interest was assigned to El Paso.*

In a number of instances the assignments to El Paso did not assign the entire working interest, but only a fraction thereof.

In such a situation the trial court held that it was not sufficient for El Paso to prove that the portion of the well or lease assigned to it was unprofitable, but that it had the burden of proving that the entire well or lease was unprofitable before it could be reassigned pursuant to the unprofitability clause.

We hold that ruling by the trial court to be erroneous. It is impossible for El Paso to reassign that which was not assigned to it. El Paso was, by the unprofitability and undeveloped acreage clauses, authorized to reassign that which had been assigned to it when that which had been assigned to it became unprofitable.

*The Affirmative Defenses.*

The trial court summarily ruled on the issues raised by the affirmative defenses pleaded by defendants. At paragraph 13 of its judgment it recited a conclusion of law: "All of plaintiff's claims are barred by *res judicata*, settlement, waiver, laches, estoppel and the applicable Statute of Limitations." We shall discuss those defenses individually.

■ *Res Judicata:* The defendants based their plea of res judicata on their contention that the claims asserted here by plaintiff had been adjudged against it in the Sun Oil Company case before the federal district court. We hold that plaintiff's claims had not been so adjudicated. Plaintiff's claims asserted in this case are not within the jurisdiction of the federal court that tried the *Sun Oil Co.* case. That court may have been authorized to accept pendent jurisdiction if it chose, but it specifically declined to do so. A judgment rendered by a court having no jurisdiction of claims or rights asserted in a later case does not support a plea of res judicata or estoppel by judgment of claims made in the later case. 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4436 (1981).

■ *Settlement:* This defense is claimed to have resulted from the 1974 settlements. We have read carefully the settlement agreement between plaintiff and those defendants who own overriding royalties under GLA 47. We have failed to find any language that can reasonably be construed as having indicated an agreement that either the unprofitability or the undeveloped acreage clause be rendered no longer effective. In fact one of the "whereas" clauses in the preamble recites: "Whereas the parties are desirous of avoiding further disputes and further arbitration and to set at rest the issues in pending litigation and arbitration to determine the applicable overriding royalty to be paid by El Paso to Tenneco-Continental both now and in the future, without disposing of any other issues in such pending litigation." That preamble made quite clear the purpose of the settlement agreement as not including any change of the effect of the unprofitability or undeveloped acreage clauses.

The unambiguous settlement agreement did include language unambiguously cancelling the parties' agreement for arbitration. At paragraph 4 it provided:

4. The parties agree that Article XII and Article III, Section 2, Paragraph C, of GLA 47, are hereby suspended only so long as Tenneco-Continental are receiving payment for their overriding royalty in the manner specified in this agreement. In the event of a disagreement or controversy over any provision of this settlement agreement or the application or determination of any rate thereunder, the parties agree that the arbitration provisions of GLA 47 shall not apply.

We hold, as a matter of law, that the language of the 1974 settlement does not provide for cancellation or forfeiture of plaintiffs rights under either the unprofitability or the undeveloped acreage clause.

■ *Waiver:* Of the defense "waiver," the Supreme Court in *Texas & P. Ry. Co. v. Wood,* 145 Tex. 534, 199 S.W.2d 652, 656 (1947) said, "A waiver has been frequently defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it." The right to reassign unprofitable wells and non-commercial undeveloped acreage did not accrue until October 1, 1983, the effective date of El Paso's implementation of *Mid-La.* It is

true that in the years between the execution of the GLA's containing the unprofitability and undeveloped acreage clauses and the United States Supreme Court decision in *Mid-La,* El Paso had not tried to invoke the unprofitability clause as a basis for reassignment of a well or lease. That, however, was not action (or inaction) inconsistent with its claim of the option to do so if a well or lease became unprofitable.

El Paso did, however, reassign some leases pursuant to the undeveloped acreage clause in the early 1960's, and those reassignments were accepted.

Furthermore, waiver is an affirmative defense of which the defendants had the burden of proof. They had the burden of proving that El Paso had intentionally waived its right to reassign or had intentionally conducted itself in such a manner as was inconsistent with their having such a right to reassign.

■ There is no evidence that El Paso intentionally waived its right to reassign under either the unprofitability clause or the undeveloped acreage clause. As to the unprofitability clause, El Paso had the *option* to reassign. Its failure to exercise that option is not inconsistent with a desire to keep an unprofitable well with a hope of making it profitable by reworking it. It was not evidence of conduct inconsistent with claiming a right to reassign it. While the language of the undeveloped acreage clause did not include the word "option," it did, in effect, give El Paso an option to reassign a drilling unit. It provided that if future development in the area of a drilling unit should evidence that such unit will not be productive of gas in commercial quantities and for that reason "El Paso shall not desire" to drill a well thereon, El Paso may reassign the unit.

We hold that there was no evidence establishing that El Paso waived its right to reassign and that the trial court erred in holding that El Paso's claims were barred by waiver.

■ *Laches:* In *City of Fort Worth v. Johnson,* 388 S.W.2d 400, 403 (Tex.1964), the court said:

Two of the essential elements of laches are (1) unreasonable delay by one having legal or equitable rights in asserting them and, (2) a good faith change of position by another to his detriment because of the delay. (Citations omitted.)

There is no evidence in this record that supports defendants' burden of proof as to either of those two requisites for the application of the defense of laches. El Paso did not unreasonably delay its assertion of its right to reassign. That right was conditioned on the wells or leases becoming unprofitable, which condition was not met until the Supreme Court decided *Mid-La* in 1983. The defendants did not change their position because of any delay in El Paso's asserting its right to reassign. Their position is now, and has been since the execution of the GLA's, that of the owners of the overriding royalties payable by the operator of those properties assigned pursuant to the GLA's. In fact, the defendants applied for, and were granted, a temporary injunction maintaining that position during the pendency of this trial.

We hold that the trial court erred in ruling that plaintiff's claims were barred by the defense of laches.

■ *Estoppel:* The trial court did not specify in its conclusion of law, which we have quoted above, whether the estoppel that barred plaintiff's claims was equitable estoppel or collateral estoppel. We have, in our discussion of res judicata, discussed and ruled on the collateral estoppel question. We will now rule on the equitable estoppel question.

In *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 932 (1952) the court said:

On the question of estoppel we find that "In order to constitute an equitable estoppel or estoppel in pais there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was

made must have relied on or acted on it to his prejudice." 31 C.J.S., Estoppel, sec. 67, page 254. Also, "Before an estoppel can be raised there must be certainty to every intent, and the facts alleged to constitute it are not to be taken by argument or inference. Nothing can be supplied by intendment. No one should be denied the right to set up the truth unless it is in plain contradiction of his former allegations or acts. If an act or admission is susceptible of two constructions, one of which is consistent with a right asserted by the party sought to be estopped, it forms no estoppel." Id. sec. 77, page 282, et seq.

There is no evidence in this record proving or tending to prove any one of the necessary elements required to establish equitable estoppel which would bar El Paso from recovering on its claims herein. The defendants did not meet their burden of proof.

We hold that the trial court erred in concluding that the plaintiff's claims were barred by estoppel.

■ *Statute of Limitations:* This is a suit for declaratory judgment authorized by Tex.Civ.Prac. & Rem.Code sec. 37.003 (Vernon 1986) (formerly Tex.Rev.Civ.Stat. Ann. art. 2524–1). A cause of action for declaratory judgment does not accrue until a justiciable controversy between the parties thereto arises. *California Products, Inc. v. Puretex Lemon Juice, Inc.,* 160 Tex. 586, 334 S.W.2d 780, 781 (1960). The controversy between the parties hereto with respect to the issues as to which adjudication is here sought—reassignment under the unprofitability, undeveloped acreage, and 500 Mcf clauses—arose on August 1, 1983, when El Paso undertook to reassign wells and leases pursuant to those clauses and the defendants denied El Paso's right to so reassign those wells and leases. El Paso filed this suit on the day this controversy arose, August 1, 1983.

The trial court erred in concluding that El Paso's claims are barred by the statute of limitations.

■ We have held that all three of the "controversial clauses" are unambiguous.

That means that our construction of them are holdings of law, not of fact. *City of Pinehurst v. Sponer Addition Water Company,* supra. However, our holding that the 500 Mcf clause does not afford El Paso a basis on which to reassign a well on a federal lease that produces less than 500 Mcf per day is not to be construed as a holding that such well may not be reassigned under any circumstances. If El Paso met the conditions imposed on it, that is, the proof of its unprofitability, and the giving of the required notice, then it could be reassigned pursuant to the unprofitability clause.

The trial court, in response to the defendants-cross-plaintiffs' prayer for injunction to enforce their claimed rights, rendered judgment for such injunction. That portion of this trial court's judgment is reversed because it imposed on El Paso duties which, we have held, it did not have. It also enforced rights of the defendant which, we have held, they do not have. We render judgment denying defendants' prayer for injunction, without prejudice, however, to defendants' right to seek and get injunctive relief should El Paso attempt, in connection with its reassignments, to exercise rights or to enforce duties inconsistent with this opinion.

The trial court also denied to plaintiff its prayed for injunctive relief to enforce its claimed construction as to its rights and duties. This action of the trial court, if error, was harmless since we have construed plaintiff's rights and duties. We assume that, upon the judgment of an appellate court becoming final and no longer appealable, the parties hereto will be guided thereby as to rights and duties relating to reassignments. We therefore decline to reverse the trial court's judgment denying El Paso's prayer for injunction and to render judgment granting plaintiff's prayer for injunctive relief. However, our ruling in this regard is without prejudice to plaintiff's right to seek and get injunctive relief should defendants fail or refuse to abide by a final judgment herein.

The trial court's judgment denied plaintiff any judgment on its claim for money damages. The plaintiff, as appellant, did not present a point of error by which it challenged the propriety of that ruling. The trial court's judgment in that respect is, therefore, affirmed.

The trial court also rendered judgment that the defendants recover from plaintiff their court costs and their attorneys fees and denying plaintiff any recovery of attorneys' fees. As to court costs, the plaintiff, as appellant, presented no point of error challenging the propriety of the trial court's ruling, and it is, therefore, affirmed.

The plaintiff, as appellant, did present points of error challenging the propriety of the trial court's awarding of attorneys' fees to defendants and denial to plaintiff any such award. However, in its brief under those points, the plaintiff made no reference to any portion of the statement of facts which supported either of them. Nor did it cite any authorities. In fact, it did not make any argument in support of them. Therefore, plaintiff waived its points of error as to attorneys' fees. Tex. R.Civ.P. 414; *Hatch v. Davis*, 621 S.W.2d 443 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd, n.r.e.).

The trial court, under a section of its judgment headed "Declaratory Relief," rendered judgment declaring that plaintiff's attempted reassignments under the unprofitability clause of those GLA's which had such clause were "null, void, and without force and effect."

The judgment recited that such GLA's "do not contemplate either that the royalties payable under the terms of the GLA's or that the rates allowed plaintiff for gas produced from the GLA acreage shall be a factor in determining whether the operation of a well has become unprofitable under the terms of the unprofitability clause."

It recited that plaintiff's options to reassign a well, the operation of which has become unprofitable, "refers to marginal or non-commercial wells not producing in paying quantities, that being the correct construction of the contract."

The judgment also recited, as a part of its declaratory judgment, that a condition precedent to plaintiff's exercise of its option to reassign an unprofitable well "is obtaining any and all necessary regulatory approvals so as to allow defendants their correlative benefit of the contractual right to sell gas from any leases so conveyed to any purchaser of defendants' choosing."

Another recited condition to plaintiff's exercise of its option to reassign pursuant to the unprofitability clause was the tendering by plaintiff to defendants of a gas purchase contract in which plaintiff agreed to buy gas at the terms set forth in the unprofitability clause.

The tender by plaintiff of such a contract was wholly unnecessary because plaintiff had already, in the language of the unprofitability clause, executed and bound itself to such a contract.

Another recited condition precedent to plaintiff's exercise of its right to reassign was its duty to rid the property of all encumbrances, including encumbrances of federal regulations.

A final recitation in the court's judgment that plaintiff's "attempted" reassignments pursuant to the terms of the unprofitability clause were null, void and of no effect was that a condition to plaintiff's exercise of any right to reassign was the tendering to defendants of a gas purchase contract which allows them the option of a tailgate settlement, including 100 percent of the condensate and liquids extracted from the gas produced from the property reassigned.

We hold that all of the listed recitations were erroneous because each of them was in conflict with, or added to, the unambiguous provisions of either the unprofitability clause or the undeveloped acreage clause. *See Exxon Corporation v. Atlantic Richfield Company*, 678 S.W.2d 944 (Tex.1984).

We reverse that portion of the trial court's judgment wherein it held the plaintiff's tendered reassignments under the unprofitability clause to be "null, void, and

without force and effect" and render judgment that such tendered reassignments were valid and effectively reassigned wells and the units upon which they were located to the defendants who were the owners of the special overriding royalty relating to their production.

The judgment of the trial court denied plaintiff any right to reassign any undeveloped acreage under the provisions of GLA's 47, 52, 60, 61, 76, 77 and 78. We reverse the trial court's judgment in that respect and render judgment that the evidence herein shows, as a matter of law, that the acreage covered by those GLA's will not produce gas in commercial quantities to El Paso, and that El Paso's tender of reassignment of those acreages under those clauses was valid and effectively reassigned those acreages to the defendants who were the owners of the special overriding royalty relating thereto.

We further render judgment that, as a matter of law, those defendants to whom wells are reassigned under and pursuant to the unprofitability clause have the right to sell gas produced from those wells in accordance with the terms fixed by the language of said clause and El Paso has the obligation to buy such gas in accordance with such terms.