Alfred Ray HOLBEIN and Robert J. Holbein, Trustees of the Holbein Trust, Plaintiffs-Appellants,

v.

AUSTRAL OIL COMPANY, INC., Defendant,

Chevron Oil Company, Defendant-Appellee.

No. 77–2123.

United States Court of Appeals, Fifth Circuit.

Jan. 7, 1980.

Carlos Castillon, Richard N. Hansen, Laredo, Tex., for plaintiffs-appellants.

Stan L. McLelland, Lee L. Kaplan, Houston, Tex., for defendant-appellee.

Joseph A. Cohn, Jr., Corpus Christi, Tex., for South Texas Natural Gas.

Bernard W. Schrader, Coastal States Gas. Corp., Houston, Tex., for other interested parties.

Before BROWN, TJOFLAT and GARZA, Circuit Judges.

PER CURIAM:

In 1957 the Appellants, trustees for the Holbein Trust, executed a mineral lease to Appellee's predecessor in interest, Standard Oil Company of Texas (Standard). The lease provided for royalties to the lessor of one-eighth of the "amount realized" by the lessee from the sale of gas. In 1961 Standard executed a gas purchase contract with South Texas Natural Gas Gathering Company (South Texas) under which Standard obligated itself to pay all royalty payments under producer leases and to bear the burden of severance taxes and dehydration charges.

When the Appellee, Chevron Oil Company (Chevron), took over Standard's interest in the lease, it paid royalties to the Holbeins on the gross amount Chevron received from the sale of the gas to South Texas. However, the amount received by Chevron was less than the amount provided for in the gas purchase contract, due to rate regulations by the Federal Power Commission (FPC).[1] Chevron also withheld from the payments to the Holbeins their proportionate share of the state severance taxes and dehydration costs.

During two periods Chevron, under orders of the FPC, had to put in escrow a part of increased payments received from South

---

1. The pricing schedule of the gas purchase contract was as follows:
   "a. From date of initial delivery of gas hereunder to June 1, 1965: 18.5¢.
   b. From June 1, 1965 to June 1, 1969: 20.3¢.
   c. From June 1, 1969 to June 1, 1973: 22.2¢.
   d. From June 1, 1973 to June 1, 1977: 24.1¢.
   e. From June 1, 1977 to June 1, 1981: 26.-0¢."

   In contrast, on May 17, 1961 the FPC issued to Standard, Chevron's predecessor, temporary authority to sell natural gas to South Texas at 18¢ per MCF. At no time did the FPC rates equal or exceed the rates set forth in the gas purchase contract.

Texas.[2] The FPC exercised exclusive control over this escrow account. Chevron did not pay the Holbeins royalties on the amounts held in escrow.

The Holbeins brought this suit to recover three amounts: (1) The difference between the royalty payments paid by Chevron as a percentage of the price it received under FPC rate regulations and the higher amount of royalty payments that would have been made had the payments been based on the price schedule contained in the gas purchase contract between Standard and South Texas, (2) a refund of the Holbein's proportionate share of severance taxes and dehydration costs, and (3) an accounting and a declaration by the Court as to their rights to amounts held in escrow subject to further orders by the FPC.

The District Court held that all royalties had been properly computed and that Chevron was not liable to the Holbeins on any counts of the suit. We affirm.

### Computation Of Royalty Payments

■ The Holbeins cite many cases for the proposition that the FPC has no jurisdiction over royalty owners. Therefore, they argue, any FPC limitations on the amounts received by Chevron for sale of the gas should not affect the computation of royalty payments. They assert that, since the FPC does not apply to them, this is a simple suit in contract and the critical question is whether the lease or the gas purchase contract controls for determining the amount of royalty payments.

We can agree with the Holbeins up to this point, but we cannot follow the next step of their reasoning. The lease provides that royalty payments "shall be one-eighth of the amount realized from [the] sale" of the gas. They argue that, since the "amount realized" was unpredictable at the time the lease between the Holbeins and Standard Oil was entered into, the pricing schedule of the subsequent gas purchase contract should control because it is the instrument which reflected a realistic estimate of what the "amount realized" would be.

We fail to see anything mysterious in the words "amount realized," which requires reference to the gas purchase contract for clarification. This language means exactly what it says—Chevron need pay royalties only on the amount realized from their sales, even if FPC rate regulations put that amount at less than it would have been under the gas purchase contract. The sales prices called for in the gas purchase contract were never collected, and Chevron cannot owe royalty payments on amounts it did not receive or did not have the right to receive. The gas purchase contract itself provides for the possibility that its terms may be superseded by federal intervention,[3] such as FPC rate regulation.

The Holbeins cite *Foster v. Atlantic Refining Co.*, 5 Cir., 1964, 329 F.2d 485 and *Texas Oil and Gas Corp. v. Vela*, Tex.1968, 429 S.W.2d 866, for the proposition that royalties can be based on amounts other than those "realized," even if this becomes burdensome to the lessee/producer because the amount he is receiving from the sale of the gas is less than the amount on which royalty payments are based. These cases so hold. However, they also hold that when there is a conflict between the lease and the

---

**2.** From February 1, 1964 to March 23, 1964, Chevron collected 18¢ per MCF from South Texas but paid royalties to the Holbeins on only 16¢ per MCF. The excess two cents per MCF was placed in escrow.

From October 1, 1969 to July 31, 1971, Chevron collected 19.067474¢ per MCF but paid the Holbeins royalties on 19¢ per MCF. The excess 0.06747¢ per MCF was also placed in escrow.

**3.** Article XII of the Gas Purchase Contract provides:

"This Contract is subject to all present and future valid laws and lawful orders of all regulatory bodies now or hereafter having jurisdiction of the parties or either of them; and should either of the parties, by force of any such law or regulation imposed . . . be ordered or required to do any act inconsistent with the provisions of this Contract, the Contract . . . shall then be deemed modified to conform with the requirements of such law or regulation so long as the same remains in effect."

gas purchase contract, *it is the lease that controls.* *Vela,* 429 S.W.2d at 870; *Foster,* 329 F.2d at 490. In both cases, royalties were computed on the basis of the market price of the gas, rather than amounts received by the lessee, but this was only because the lease provided for royalties based on market price, *not* amount received.

Unfortunately for the Holbeins, their lease provided for royalties based on the amount realized by the lessor, and this amount was controlled by the FPC.

### Taxes And Production Costs

We feel, and the Holbeins have practically conceded, that resolution of the issue of computation of royalty payments controls the result on the other issues as well.

Since the Holbeins were not parties to the gas purchase contract, it does not control for purposes of determining who pays the severance taxes and dehydration costs. The lease makes no provisions with respect to these matters. Therefore Texas law governs.

■ Texas Tax Gen.Ann. art. 3.03(5) (1969), referring to the state severance tax, states:

"The tax herein levied shall be borne ratably by all interested parties, including royalty interests; and producers and/or purchasers of gas are hereby authorized and required to withhold from any payment due interested parties, the proportionate tax due and remit the same to the Comptroller."

We believe this provision disposes of the severance tax issue.

■ With regard to dehydration costs, again the gas purchase contract is not applicable because the Holbeins were not parties to it. Moreover, this contract only provided that South Texas, the purchaser, reimburse Chevron, the seller, for dehydration costs. It said nothing about the Holbeins' liability for these expenses. The lease makes no

provision for payment of severance taxes, so again we must turn to general oil and gas law. Professor Williams and other commentators[4] have stated that lessors normally bear a proportionate share of dehydration costs:

§ 645.2 EXPENSES SHARED BY OPERATOR AND NON–OPERATOR.

A royalty or other non-operating interest in production is usually subject to a proportionate share of the costs incurred subsequent to production where, as is usually the case, the royalty or non-operating interest is payable 'at the well'. Among these 'subsequent to production' costs borne by non-operating interests as well as by operating interests are the following:

1. Gross production and severance taxes. Some leases and other agreements include an express provision concerning the location of severance and production taxes . . .

\* \* \* \* \* \*

3. Expenses of treatment required to make the mineral product salable, *e. g.,* expenses of *dehydration.* [Emphasis supplied.]

Williams & Meyers, Oil and Gas Law § 645.2 (1972). We hold that Chevron was correct in deducting from its royalty payments to the Holbeins their proportionate share of both the severance taxes and dehydration costs.

### Amounts Held in Escrow

■ The final thing sought was an accounting of royalty payments on the amounts held in escrow under orders of the FPC. Because the FPC, now the Federal Energy Regulatory Commission (FERC), exercises complete control over these monies, they are not yet "amounts realized" by Chevron and therefore no royalty payments are yet owing on them. Argument reflects that there is no dispute as to these amounts and when and as the FERC releases all or

4. *See also* 3 Kuntz, Law of Oil and Gas, §§ 40.5, 42.2 (1967); Altman & Lindberg, Oil and Gas: Non-Operating Oil and Gas Interests' Liability for Post-Production Costs and Expenses, 25

Okla.L.Rev. 363 (1974); Lange, The Production of Oil and Gas and Some of the Problems reached by it, 22nd Oil and Gas Inst. 113 (Matthew Bender 1971).

portions of the escrowed funds Chevron will make prompt payment to the Holbeins.

AFFIRMED.