**Edward Turner DAVIS, Jr., et al.,**
**Plaintiffs-Appellees,**

v.

**CIG EXPLORATION, INC.,**
**Defendant-Appellant.**

No. 85–1030.

United States Court of Appeals,
Fifth Circuit.

May 12, 1986.

Rehearing and Rehearing En Banc
Denied June 12, 1986.

Edward S. Koppman, Akin, Gump, Strauss, Hauer & Feld, Ruth Abboud Cross, Dallas, Tex., Edmonds, Lagrone & Smith, Thomas L. Edmonds, Borger, Tex., Deborah S. Bryant, CIG, Houston, Tex., for defendant-appellant.

Ronald D. Nickum, Amarillo, Tex., for plaintiffs-appellees.

Before JOLLY and HILL, Circuit Judges, and HUNTER,* District Judge.

ROBERT MADDEN HILL, Circuit Judge:

Defendant-appellant CIG Exploration, Inc. (Exploration) appeals from an adverse judgment after a jury found it breached its implied covenant to reasonably market the natural gas from a well on the plaintiffs-appellees' land. Because the district court erred in not granting Exploration's motions for directed verdict and for judgment notwithstanding the verdict, we reverse and render judgment for Exploration.

## I.

In June of 1977 R.C. Callan, an independent lease broker, approached Edward Davis, Jr., and his wife, Freda Davis, two of the plaintiffs,[1] and proposed that they lease the minerals under their land to him for possible oil and gas development. After several days of negotiations, Edward and Freda Davis signed an oil and gas lease in return for a bonus of $100 per acre, a one-fifth royalty interest, and delay rentals of $1 per acre per year. The lease also contained the usual two-pronged royalty clause for gas, providing for royalty calculated as a percentage of market value if the operator sold the gas off the lease and providing for royalty calculated as a percentage of the amount realized if the operator sold the gas at the well.

At the time Edward and Freda Davis executed the lease they knew that Callan would assign the lease to another entity to conduct the exploration and drilling. On September 30, 1977, Callan assigned the lease to Exploration, a company engaged in the exploration for and development of oil and gas. On February 24, 1978, Exploration entered in a joint venture with John Cox, the Hassie Hunt Trust, and Hunt Petroleum Corporation to develop the acreage. Exploration retained 62.5% of the working interest and agreed to serve as the operator. Exploration spudded the well on March 25, 1978, and completed it on July 3, 1979, at a producing interval of 17,329 to 17,466 feet. Exploration and the other joint ventures entered into contracts with Colorado Interstate Gas Company (Colorado Interstate) to sell the gas to Colorado Interstate. Each contract provided for a sales price calculated as follows:

> For all gas delivered to Buyer, Buyer shall pay Seller the ceiling prices, including all adjustments and escalations, applicable to the gas covered by this Agreement, as established by the Federal Energy Regulatory Commission or other federal or state governmental authority having jurisdiction (FERC) or under the Natural Gas Policy Act, or any amendments or successor legislation thereto. The price shall change to conform to all such adjustments and escalations on the date they become effective as to the gas covered hereby.

> \*　　\*　　\*　　\*　　\*　　\*

> In the event the regulation of the price at which natural gas is sold under this Agreement ceases, then the price hereunder in effect immediately prior thereto shall continue in effect for a period of 1 year from the date such regulation ceases; and for each successive 1–year period thereafter, the price shall increase 1½ cents per Mcf above the price for the preceding period, provided, however, that in the event such regulation ceases and the price provided by this Subparagraph (c) becomes operative, Buyer shall, anything in this Agreement or in the General Conditions hereof to the contrary not-

---

\* District Judge of the Western District of Louisiana, sitting by designation.

**1.** Shortly after they signed the lease, Edward and Freda Davis gave a portion of their royalty interest to their son, Turner Davis, and to their daughter, Georgeanna Davis Dorney, both plaintiffs below. Hereafter the plaintiffs-appellees will be collectively referred to as the Davises.

withstanding, reimburse Seller to the extent of 100 percent of any and all increases in production taxes or royalties for which Seller becomes liable as a result of the cessation of regulation and the attribution of value to said gas in excess of the price otherwise payable.

The contract also specified that gas would be sold at the well, thereby triggering the amount realized prong of the lease royalty clause. The contract did not include a provision allowing the seller to, if deregulation occurred, periodically force redetermination of the price.

In November 1979, pursuant to the Natural Gas Policy Act, the Federal Energy Regulatory Commission (FERC) ceased regulating the price of gas from wells drilled after February 19, 1977, and to a depth below 15,000 feet (section 107 gas). Soon thereafter the Davises noticed that their royalty checks remained approximately the same following the deregulation of section 107 gas while their neighbors' checks for comparable quantities of section 107 gas increased substantially following deregulation. After failing to obtain an answer to their satisfaction from Exploration as to why their checks were for a lesser amount than their neighbors, the Davises filed suit against Exploration, alleging, *inter alia*, that Exploration breached its implied covenant to reasonably market the gas. Exploration denied liability and argued that it had not breached the implied covenant because a Federal Power Commission (FPC)[2] order determined the price at which Exploration could sell the gas it produced.

A full understanding of Exploration's defense requires an explanation of the circumstances surrounding the creation of the FPC order. In the early 1970s the gas industry began experiencing a gas shortage which caused curtailment of service in winter months; federal regulation of gas sold in the interstate market partly caused the shortage. Because gas sold in the intrastate market brought a higher price than gas sold in the interstate market, independent producers would avoid the interstate market whenever possible. As a result, interstate pipeline companies were depleting their reserves and found themselves unable to acquire new gas supplies. In order to alleviate the problem, the FPC encouraged pipelines to develop innovative ideas to increase gas reserves.

During this time, Colorado Interstate became aware that another pipeline, Panhandle Eastern Pipeline, had proposed a new procedure to the FPC and had obtained FPC approval of the proposal. Panhandle Eastern Pipeline's proposal allowed it to raise its sales prices for interstate gas and to use the differential between the old and new prices to establish a fund which it would use to explore for new gas supplies. Colorado Interstate filed a similar application with the FPC requesting permission to raise its prices and to charge its customers the "area rate" for gas from old leases which were still subject to the lower "cost of service" price.[3] Colorado Interstate submitted its plan in January 1973 and proposed to use the funds generated from the price increase, approximately $10,000,000 per year, for a five year exploration and production program. The FPC staff studied the proposal for the next twelve months, made numerous changes, and conducted extensive hearings on the application. On January 7, 1974, the FPC found the application "to be in the public interest" and promulgated an order incorporating the terms of the application.

The FPC order required Colorado Interstate to establish a separate entity, Exploration, to carry out the planned exploration

---

**2.** The Natural Gas Policy Act of 1978 authorized the creation of FERC, who then assumed the duties formerly delegated to the FPC.

**3.** Prior to 1965 the FPC established a "cost of service" price separately for each individual producer based on each producer's costs. Beginning in 1965 the FPC began establishing prices on a geographic area basis, rather than on an individual basis. The price established for each geographic area was known as the "area rate." In 1974 the FPC began establishing gas prices on a nationwide basis and promulgated the first "national rate" that year.

for and production of new gas reserves. The FPC required the establishment of a separate entity in order to provide a better means to conduct the exploration and production activities, to permit closer scrutiny by the FPC, and to maintain an arms-length relationship between Exploration and Colorado Interstate. The order permitted Colorado Interstate to transfer certain producing properties to Exploration and then permitted Exploration to sell gas from these properties to Colorado Interstate at the last area or national rate, instead of at the cost of service price. The order further required Exploration to spend the funds generated by the price increase on exploration for and development of new gas supplies. The order also specified the price at which Exploration could sell the gas discovered with the use of funds generated by the price increase.

> Sales [of] New Gas (Natural gas produced from leases acquired through the use of Fund monies.) will be made by Exploration to [Colorado Interstate] under life-of-the-field contracts at prices not exceeding the applicable area rate (or national rate if such shall be established by the Commission) subject to adjustments for Btu content, production taxes, and other factors permitted by the applicable regulations of the Commission. Should the price of New Gas be not regulated, Exploration shall be entit[l]ed to sell the New Gas to [Colorado Interstate] at the applicable area rate in effect immediately prior to nonregulation with a 1.5 percent Mcf annual escalation and subject to adjustments for royalty payments and production ta[x]es for which Exploration is liable as a result of value attributed to the New Gas as a result of nonregulation which is in excess of the rate allowed under the settlement agreement.

Thus, Exploration could sell gas it discovered at the prevailing area or national rate; however, in the event of deregulation, Exploration would not be able to sell the gas at the prevailing market price; rather, Exploration would have to sell the gas at the last applicable area or national rate plus an annual increase of one and one-half cents per thousand cubic feet (mcf). Exploration incorporated these pricing provisions in its gas sales contract with Colorado Interstate.

When Congress deregulated the price of section 107 gas in November 1979, the price of the gas began to rise dramatically. Thus, while the Davises' neighbors received greatly increased royalties following deregulation, the Davises' royalties remained approximately the same. As previously mentioned, the Davises filed suit in an effort to recover royalties similar to those their neighbors received.

After a five day trial, a jury found that: (1) Exploration failed to act as a reasonably prudent operator in marketing the gas, the Davises received less than they would have received had Exploration acted properly, and Exploration's actions damaged the Davises in the amount of $623,952.66, (2) Exploration did not make the sale at arms length, Exploration sold the gas for less than market value, and Exploration's actions damaged the Davises in the amount of $623,952.66, and (3) R.C. Callan and Edward Davis both believed that the company that Callan planned to assign the lease to would get a "fair" price, both were mistaken in that belief, and the mistake was material and relied on by Edward Davis. The district court entered judgment based on the first set of findings and specifically refused to enter judgment on the second and third sets of findings. The district court overruled timely motions by Exploration for directed verdict and for judgment notwithstanding the verdict. This appeal followed.

## II.

Exploration urges numerous grounds for reversing the district court's judgment; however, we need only address the first issue.[4] Exploration argues that the district

---

4. Exploration raised the following additional issues: (1) whether the district court erred in failing to grant a judgment notwithstanding the verdict or a directed verdict because the evi-

court should have entered judgment for it as a matter of law because the FPC established the price at which it could sell gas and because, alternatively, under Texas law there can be no breach of the implied covenant to reasonably market when the lessee sells gas at the price imposed by government regulatory authorities. We agree with both of Exploration's arguments and therefore reverse and render judgment for Exploration.

Texas law has long recognized that an oil and gas lessor is often at the mercy of his lessee. *See, e.g., W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27 (1929). The lessee decides when to drill, where to drill, and how many wells to drill. Thus, if the lessee decides not to drill, or drills too few wells, the lessor will realize no royalties or less royalties than he might reasonably expect. Furthermore, the lessee, because he may have taken leases from numerous lessors, often faces inherent conflicts of interest. Donohoe, *Implied Covenants in Oil and Gas Leases and Conservation Practice*, 33 Inst. on Oil & Gas L. & Tax'n 97, 98 (1982). The lessee may have little economic incentive to develop a lease if he already has a well on a neighboring lease which is draining the minerals from underneath the undeveloped lease. *See, e.g., Chapman v. Sohio Petroleum Co.*, 297 S.W.2d 885 (Tex.Civ.App.— El Paso 1956, writ ref'd n.r.e.). The problem is further exacerbated if the royalty on the producing lease is for a lesser fraction than the royalty on the undeveloped lease. *See, e.g. Amoco Production Co. v. Alexander*, 622 S.W.2d 563 (Tex.1981).

To balance the significant powers vested in the lessee against the lessor's interest in seeing the lease developed, and to discourage the lessee from considering only its own interests when a conflict of interest develops, the Texas courts have developed numerous implied covenants to protect the lessor. For example, the lessee has an implied covenant to prevent drainage by drilling offset wells, *Middle States Petroleum Corp. v. Messenger*, 368 S.W.2d 645, 654 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r.e.), an implied covenant to reasonably develop the land after paying production occurs, *Clifton v. Koontz*, 325 S.W.2d 684, 695–96 (Tex.1959), and, most importantly for this litigation, the lessee has an implied covenant to reasonably market gas discovered on the lease, *Amoco Production Co. v. First Baptist Church of Pyote*, 579 S.W.2d 280 (Tex.Civ.App.—El Paso 1979), *writ ref'd n.r.e. per curiam*, 611 S.W.2d 610 (Tex.1980). These implied covenants apply just as if the parties to the lease wrote them into the lease. *McCarter v. Ransom*, 473 S.W.2d 235, 238 (Tex.Civ. App.—Corpus Christi 1971, no writ).

■ The lessee breaches the implied covenant to reasonably market if he fails to obtain terms in the gas sales contract that a reasonably prudent operator would have obtained. The implied covenant to reasonably market gas applies even when the gas sales contract provides that sales occur at the well and the lease contains the standard two-pronged royalty clause. *First Baptist Church*. Thus, although the royalty clause specifies that the lessee will pay royalties based on the amount realized when sales occur at the well, the courts may recalculate the royalty based on market price if the lessee breaches the implied covenant to reasonably market the gas.

■ The Davises argue that Exploration breached the implied covenant to reasonably market by failing to include a price

dence insufficiently supported the jury's finding that Exploration failed to market the gas as a reasonably prudent operator, (2) whether Exploration was entitled to judgment as a matter of law because the force majeure clause of the lease suspended the implied covenant to reasonably market, (3) whether the evidence sufficiently supported the damages found by the jury, (4) whether the district court erred in awarding the full amount of the damages when Exploration was responsible for only 62.5% of the royalties due the Davises, (5) whether the district court erred in awarding the full amount of the damages since the Davises signed division orders covering part of the period when the damages accrued, and (6) whether the district court erred in admitting evidence of conversations between the Davises and R.C. Callan when there was no evidence that Callan was Exploration's agent or representative.

redetermination clause in the gas sales contract. At the time Exploration entered in the gas sales contract with Colorado Interstate in 1979, other lessees, knowing that deregulation of section 107 gas would occur in just a few months, included price redetermination clauses in their gas sales contracts.[5] Nevertheless, the Davises' argument must fail for two reasons. First, under our holding in *Holbein v. Austral Oil Co.*, 609 F.2d 206 (5th Cir.1980), when an FPC order controls the selling price, the courts cannot hold a lessee liable for failing to sell above that price. Second, in a case where the federal regulatory agency has set the price, Texas law defines market value as the price set by the regulatory agency; therefore, the courts cannot hold a lessee liable for failing to sell above the regulated price.

In *Holbein* the gas sales contract between the lessee and the pipeline called for a higher price than the price permitted by the FPC order issued to the lessee. The lease provided for royalties to the lessor based on the "amount realized" by the lessee from the sale of gas. Accordingly, the lessee paid royalties based on the price specified in the FPC order. The lessor brought suit claiming that any FPC limitations on the amounts received by the lessee should not affect the computation of royalty payments and that the royalty payments should be based on the amounts specified in the gas sales contract. We rejected the lessor's argument and stated: "Unfortunately for the Holbeins, their lease provided for royalties based on the amount realized by the lessor, and this amount was controlled by the FPC."

The rationale of *Holbein* applies with equal force in the instant case. The Davises' lease provided for royalties based on the amount realized when the sale occurred at the well, and the FPC controlled the amount realized. Since Exploration paid royalties based on the price specified in the FPC order, under our holding in *Holbein*,

Exploration cannot be held liable for failure to pay royalties based on a higher amount.

█ The Davises' argument must also fail for a second reason. They argue that, since Exploration breached the implied covenant to reasonably market, their royalty should be based on the market price of the gas; however, Texas law provides that, when a governmental authority controls the price, the market price equals the regulated price. *See Flowers v. Diamond Shamrock Corp.*, 693 F.2d 1146 (5th Cir. 1982); *Bowers v. Phillips Petroleum Corp.*, 692 F.2d 1015 (5th Cir.1982); *First National Bank in Weatherford v. Exxon Corp.*, 622 S.W.2d 80 (Tex.1981); *Exxon Corp. v. Middleton*, 613 S.W.2d 240 (Tex. 1981). Thus, a lessee who sells at the maximum price permitted by federal regulatory authorities cannot be held liable for any excess royalty because the market value of gas cannot exceed the price set by federal authorities. Since Exploration sold the gas produced from under the Davises' land at the maximum price set by federal authorities and paid royalties based on that price, Exploration fulfilled its duties under the implied covenant to reasonably market.

The Davises urge one further reason in support of the jury's verdict. They point out that the pricing provision in the gas sales contract contained a pass through provision for royalty costs:

[I]n the event such regulation ceases and the price provided by this Subparagraph (c) becomes operative, Buyer shall, anything in this Agreement or in the General Conditions hereof to the contrary notwithstanding, reimburse Seller to the extent of 100 percent of any and all increases in production taxes or *royalties for which Seller becomes liable* as a result of the cessation of regulation and the attribution of value to said gas in excess of the price otherwise payable.

**5.** The redetermination clauses usually gave the seller the right to force redetermination periodically. The redetermined price would typically consist of the arithmetic average of the three highest prices obtained for similar gas in a specified surrounding area within a specified preceding time period.

(emphasis added). The Davises contend that Exploration breached a duty to them by not passing through a royalty based on market price. The contract, however, permits Exploration to pass through only those royalties for which Exploration becomes "liable." The Davises fail to provide any theory, and we have not been able to find one, under which Exploration would be liable to them for higher royalties. Texas case law and our holding in *Holbein* show that Exploration is not liable to the Davises for higher royalties simply because the market price for deregulated gas exceeds the price at which the FPC permits the sale of similar gas. Therefore, the Davises' final contention fails to support the jury's verdict.[6]

### III.

Pursuant to our holding in *Holbein* and the Texas cases equating market price with the federally regulated price, we find that the district court erred in not entering a judgment in favor of Exploration as a matter of law. Exploration did not breach its duty to reasonably market the gas because it sold the gas at the maximum price permitted by the FPC order. The judgment of the district court is reversed and the case is remanded with instructions to enter judgment in favor of Exploration.

REVERSED.

---

**6.** We realize that our conclusion that Exploration did not breach its duty to reasonably market may appear harsh in light of the fact that the Davises' neighbors received substantially more royalties for similar gas and that the Davises had no control over who would be their ultimate lessee. We note, however, that the Davises' past misfortune may now be their good fortune. With the recent decline in the price paid for natural gas, the Davises may receive more than the market price for gas, and the price the Davises receive will escalate annually while the market price for gas may fluctuate. We further note that the amount of royalty lessors receive is often beyond the control of the lessor. Had Exploration discovered the gas before February 19, 1977, or above 15,000 feet, the National Gas Policy Act would not have classified the gas as section 107 gas and deregulation would have occurred at a later date.