James M. CONDRA; Bruce R. Lively; and Linda Whitten St. Romain, Appellants,

v.

QUINOCO PETROLEUM, INC. and Wolverine Exploration Company, formerly American Quasar Petroleum Co. of New Mexico, Appellees.

No. 04–95–00492–CV.

Court of Appeals of Texas, San Antonio.

July 9, 1997.

Rehearing Overruled Aug. 28, 1997.

Rex H. White, Jr., Hutcheson & Grundy, L.L.P., Austin, for Appellants.

Raymond B. Kelly, III, Decker, Jones, McMackin, McClane, Hall & Bates, Fort Worth, for Appellees.

## OPINION

HARDBERGER, Chief Justice.

Appellants appeal a take nothing judgment rendered in favor of appellees. In three points of error, appellants contend: (1) appellants' division orders entitle them to share in take-or-pay settlement proceeds; (2) appellants are entitled to damages for breach of the express or implied covenant to market;

and (3) the trial court erred by not entering findings of fact and conclusions of law. In response to appellants' third point of error, we abated the appeal and ordered the trial court to enter findings of fact and conclusions of law. Our subsequent receipt of such findings and conclusions renders appellants' third point of error moot, and it will not be further addressed.[1]

## FACTS

Appellants are assignees of the original Lessee, Lively Energy Company ("Lively"), under an Oil and Gas Lease Agreement dated July 5, 1979 (the "Lease"). Lively initially assigned the rights and obligations under the Lease to appellee American Quasar Petroleum Co. of New Mexico, reserving an overriding royalty interest. Thereafter, Lively assigned the overriding royalty interest to appellants.

Appellees are the producer-operators under a certain Gas Purchase Agreement with El Paso Natural Gas Company ("El Paso") dated June 30, 1972. The gas produced under the Lease was to be sold to El Paso in accordance with the terms of that agreement. The Gas Purchase Agreement contained a take-or-pay clause obligating El Paso to take a specified quantity of gas produced under the Lease each year or pay for the gas not taken. El Paso failed to take the specified quantity of gas from 1982 through 1986, and further failed to pay for the gas not taken.

Under the Gas Purchase Agreement, El Paso was obligated to pay the NPGA price for gas rather than the "spot" or market price. Although El Paso was in breach of the agreement, appellees did not make any spot or market sales while El Paso was in breach because they wanted to get the maximum value for the gas which was the price payable under the El Paso agreement.

In January of 1987, appellees sent the lessors/royalty owners under the Lease a letter enclosing shut-in payments for the wells. The letter stated that the wells were shut-in because El Paso did not have a market for the gas from the wells. The letter

---

1. We note that our order also allowed the parties to file supplemental briefs in this court after the trial court entered its findings of fact and conclusions of law.

informed the royalty owners that the gas contract required El Paso to pay the NPGA Section 107(c)(5) rate (then $6.32/MMBTU) as compared to the spot price of approximately $1.20/MMBTU. The letter further stated that the appellees were reluctant to release El Paso from the contract because the contract provided for a greater price and the term of the contract extended beyond the projected period of gas surplus then being experienced by the country.

Ultimately, appellees filed suit against El Paso for breach of the Gas Purchase Agreement on June 30, 1987. Thereafter, appellees and El Paso resolved their dispute by entering into a Settlement Agreement dated March 31, 1988. Under the terms of the Settlement Agreement, El Paso was required to pay appellees a recoupable payment of $3,500,000 and a nonrecoupable payment of $2,310,000. The recoupable payment was a prepayment for approximately one billion cubic feet of gas to be delivered in the future. The nonrecoupable payment was consideration for certain amendments to the Gas Purchase Agreement and settlement of other claims, one of which was identified as El Paso's failure to take rateably from the appellees' wells. The Gas Purchase Agreement was amended to:(1) delete the favorable price provisions and insert market or spot pricing; (2) eliminate the take-or-pay obligation; and (3) extend the term of the agreement for an additional three years. The Settlement Agreement was subsequently amended by letter agreement dated September 28, 1988, to permit appellees to market gas produced under the Lease to third parties on the spot market without jeopardizing El Paso's right of recoupment.

Following the settlement, appellants filed the instant suit seeking in pertinent part: (1) a declaratory judgment that appellants were entitled to share in the proceeds of the take-or-pay settlement under the terms of the Lease, assignment and division orders; and (2) compensatory damages for breach of the

express covenant to market.[2] On April 10, 1989, the parties submitted an agreed record to the trial court and requested leave to file briefs addressing the documents introduced into the record and the legal authorities to support their contrasting positions. Post-trial briefs were submitted on May 5 and May 15, 1989. Supplemental briefs were submitted in November 1989. Further post-trial briefs were filed on September 23, 1994, and the trial court entered its take nothing judgment on February 3, 1995.[3]

In the findings of fact and conclusions of law filed by the trial court in response to this court's order, the trial court held, as a matter of law, that appellants were not entitled to be paid an overriding royalty on or share in the proceeds received pursuant to the Settlement Agreement. In addition, the trial court held, as a matter of law, that appellees did not breach the division orders and that there was no implied covenant to market under the Lease. Finally, the trial court held that appellees' settlement was not a breach of the express covenant to market under the Lease.

## DISCUSSION

### 1. Division Orders

■ In their first point of error, appellants assert that their division orders entitle them to share in the take-or-pay settlement proceeds.

■ Division orders govern the distribution of oil and gas proceeds, directing to whom such proceeds will be paid and in what proportion. *See Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 691 (Tex.1986); *De Benavides v. Warren*, 674 S.W.2d 353, 361 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). Thus, until withdrawn, division orders define the payment to be received by the royalty owner. *See Gavenda v. Strata Energy, Inc.*, 705 S.W.2d at 691; *De Benavides v. Warren*, 674 S.W.2d at 361.

---

2. We note that although appellants' pleadings only assert a claim for violation of the express covenant to market, given the trial court's findings and conclusions, it appears the breach of the implied covenant to market issue was tried by consent.

3. Appellees' Brief states that the delay was due to the inadvertent sealing of the trial court's file.

The assignments creating the overriding royalty interest claimed by appellants provide for the retention of "an overriding royalty of no less than three and one-third percent of eight-eights (3.333% × 8/8ths) of all the oil, gas and similar hydrocarbons that may be produced, saved and marketed from Said Lease." The division orders entitle the appellants to receive their proportional interest in "all proceeds derived from the sale of products produced from or attributable to said property...."

Appellants contend that the phrase "attributable to" modifies the term "proceeds" in the foregoing provision, and, therefore, they should receive their proportional interest in the settlement proceeds because such proceeds are attributable to the property. We believe, however that the phrase "attributable to" is intended to modify the term "products." Thus, royalty is due under the division orders on proceeds derived from the sale of *products* that are either (1) produced from the property; or (2) attributable to the property.

Given this interpretation, we discern no reasonable basis for distinguishing the aforementioned language from that set forth in the lease interpreted in this court's prior decision in *Hurd Enterprises, Ltd. v. Bruni*, 828 S.W.2d 101, 106 (Tex.App.—San Antonio 1992, writ denied). The royalty clause interpreted in *Bruni* provided for the payment of royalties on gas "... produced from said land and sold or used off the premises...." *Hurd Enterprises, Ltd. v. Bruni*, 828 S.W.2d at 106. Similarly, the division orders in the instant case contemplate the sale of products as a prerequisite to the payment of royalties.[4]

As the dissent argues, the facts in the *Bruni* decisions are distinguishable from the instant case for the reason set forth in footnote 8 of the second *Bruni* decision—that is, $2.31 million of the settlement is a nonrecoupable payment. *Hurd Enterprises, Ltd. v. Bruni*, 828 S.W.2d at 106 n. 8 (recognizing that cogent arguments exist concerning the

royalty owner's interest where the settlement terminates the purchaser's recoupment rights). Nevertheless, in *TransAmerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 596–97 (Tex.App.—San Antonio 1996, writ requested), this court considered whether royalties were payable on a portion of a take-or-pay settlement paid as repudiation damages for gas not taken when there was subsequent production. We held that no royalties were due because the repudiation damages still represented nonproduction. *Id.* at 599. Our decision in *TransAmerican* has since been followed by at least one other Texas appellate court. *See Alameda Corp. v. Transamerican Natural Gas Corp.*, 950 S.W.2d 93 (Tex.App.—Houston [14th Dist.], 1997 n.w.h.). The Houston court agreed with our analysis in *TransAmerican* and held that repudiation damages were not royalty bearing because the royalty interest at issue was tied to production. *Id.*, at 6–97–99. Relying on *TransAmerican*, the Houston court concluded that "a royalty owner's right to payment under these circumstances is no longer an open question in Texas." *Id.*, at 99.

Similar to the repudiation damages considered in *TransAmerican*, the nonrecoupable payment in the instant case was not paid for production. Therefore, we hold that the appellants' division orders do not entitle them to royalties on the take-or-pay settlement in this case. Similarly, the nonrecoupable payment in the instant case was not paid for production. Therefore, we hold that the appellants' division orders do not entitle them to royalties on the take-or-pay settlement in this case.

## 2. Covenant to Market

In their second point of error, appellants assert that the settlement was a violation of the express covenant to market. Appellants' argument under this point of error asserts that appellees' actions violated both the express and implied covenant to market. Appellees counter that appellants are not

---

4. While the language of the original Lease does not control appellees' overriding royalty interest, we note the Lease contains royalty language that is virtually identical to the Bruni lease, entitling

the lessors to a royalty "... on any and all gas, ... produced from any well and sold by Lessee, or used by Lessee,...."

entitled to enforce any express or implied covenants in the Lease, and, in any event, both the express covenant and implied covenant to market relate to production only.

### a. Ability of Assignee to Enforce Express Covenant

█ Appellees contend that since appellants acquired their overriding royalty interests through an assignment from the original Lessee, they have no right to enforce the express covenants of the Lease. As noted in appellees' brief, the treatise by Williams and Meyers addresses the issue as follows:

> The owner of an overriding royalty is not entitled to the benefit of the covenants of the base lease, express or implied, in the absence of an express provision in the instrument creating the overriding royalty. The benefits of such express and implied covenants of the lease touch and concern the lessor's estate and burdens of such covenants touch and concern the lessee's estate. The assignment, either in whole or in part, of the burdened estate will not permit enforcement of the covenants which burden the assigned estate by a person other than the lessor or claimants through him of a portion or all of the benefitted estate.

HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW § 420 (1981).

Although both the lessors under the Lease and the appellants under the assignment are entitled to certain royalties, their rights arise from different instruments. While the Texas Supreme Court has recognized an analogy between implied covenants in a lease and those in an assignment, that opinion does not support permitting an assignee to enforce an *express* covenant in the original lease. *See Bolton v. Coats*, 533 S.W.2d 914, 916 (Tex. 1975). Therefore, we conclude that appellants are not entitled to enforce the express covenant to market in the Lease.

---

**5.** Since the express covenant in the Lease may be interpreted more narrowly than the implied covenant arising under the assignment, the trial court's conclusion that the express covenant was not breached does not reach the issue as to whether the implied covenant was breached.

### b. Ability of Assignee to Enforce Implied Covenant

█ The Texas Supreme Court has recognized an assignee's right to enforce implied covenants arising under an assignment. *See Bolton v. Coats*, 533 S.W.2d at 917; *Cole Petroleum Co. v. U.S. Gas & Oil Co.*, 121 Tex. 59, 41 S.W.2d 414, 416 (Tex.1931); *see also Wes–Tex Land Co. v. Simmons*, 566 S.W.2d 719, 721–22 (Tex.Civ.App.—Eastland 1978, writ ref'd n.r.e.)(extending implied covenant to protect against drainage to assignee); *see generally* Richard D. Watt, *To Share or Not to Share: Royalty Obligations Arising Out of Take–or–Pay or Similar Gas Contract Litigation*, 42ND INST. ON OIL & GAS L. & TAX'N 14–68, 14–69 (1991)(recognizing extension of implied covenant to overriding royalty owners). One of the covenants implied in such assignments is the covenant to market. *See Cole Petroleum Co.*, 41 S.W.2d at 416 (implying covenant to market in assignment creating overriding royalty interest where express covenant was absent). Following this precedent, therefore, we conclude appellants have the right to enforce the implied covenant to market arising under their assignment. Since the implied covenant arises out of the assignment, the terms of the express covenant in the Lease, which is a different instrument, should not be used to negate or restrict the breadth of the implied covenant.[5]

### c. Breach of Implied Covenant

█ Having concluded an implied covenant to market arises under the assignment and is enforceable by the appellants, the final issue to be considered is whether the implied covenant can be breached through the appellees' settlement of a claim for breach of the take-or-pay provisions in a gas purchase contract.[6] Appellees maintain that the implied covenant to market is limited to the market-

---

**6.** Although the trial court erroneously concluded that there was no implied covenant to market, if the settlement of a claim for a breach of such a take-or-pay provision cannot result in a violation of the implied covenant to market as a matter of law, the trial court's conclusion would be harmless. Therefore, we address whether the implied covenant can be breached by such a settlement.

ing of actual production quoting from the language in *Mandell v. Hamman Oil and Refining Co.*, 822 S.W.2d 153, 164 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

In *Mandell*, the appellants were contending that the operator breached its marketing duties. *Id.* The court held that the marketing covenant requires the lessee to ensure that *"gas that is produced* is sold for the best price or under the best terms." *Id.* The court concluded:

> We hold that take or pay is not a benefit that appellants [the royalty owners] received via execution of the lease with Hamman [the producer] and does not flow from the marketing covenant of the lease. Hamman was required to obtain for appellants only benefits received that were related to the sale of gas that had been produced.

*Id.* at 165. This court also has recently held that the duty to reasonably market is not triggered in the absence of production. *TransAmerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d at 598. We stated that "[t]ake or pay is not a benefit which flows from the marketing covenant of a lease." *Id.* at 600. Since the appellees were only required to obtain benefits for the appellants under the marketing covenant after the actual production of gas and the settlement payments at issue here were paid in the absence of production, the duty to reasonably market has not been breached. *See id.; see also Alameda Corp. v. Transamerican Natural Gas Corp.*, 950 S.W.2d at 99–100 (duty to market not triggered in absence of production).

## CONCLUSION

Appellants' division orders do not entitle them to share in the take-or-pay settlement proceeds. Furthermore, the implied covenant to market was not breached because

production was absent. For these reasons, we affirm the judgment of the trial court.

RICKHOFF, J., dissents, joined by GREEN and DUNCAN, JJ.

RICKHOFF, Justice, dissenting.

Are royalty owners to be left entirely to the "good will" of the gas producers despite the terms of their agreements and the implied covenants arising thereunder? The majority opinion relies upon this court's *en banc* decision in *TransAmerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591 (Tex.App.—San Antonio 1996, writ requested) as support for its holding that no royalties are owed in the instant case. Although writ has been requested in *TransAmerican*, no action has been taken to date by the Texas Supreme Court. Because the majority opinion refuses to recognize the cogent distinction between recoupable and nonrecoupable take-or-pay settlement payments and because the majority opinion fails to acknowledge the full extent of the appellees' duties under the implied covenant to market, I respectfully dissent.

## 1. Division Orders

In *TransAmerican*, this court considered whether royalties were payable on a portion of a take-or-pay settlement paid as repudiation damages for gas not taken when there was subsequent production. 933 S.W.2d at 595 (royalties sought on gas produced and sold between October 1, 1987 through December 31, 1989). In the original panel opinion, which became the dissenting opinion after rehearing *en banc*, the court quoted footnote 8 of the second *Bruni* decision and held that royalties were due on that portion of the settlement payment to which actual production could be attributed.[1] *Id.* at 607–08 (Duncan, J., dissenting). After reconsideration *en banc*, the new majority opinion reversed the original panel's position and held that no royalties were due because the

1. Footnote 8 recognizes that "cogent arguments concerning the royalty owner's interest in take-or-pay settlement funds, especially when, as here, the settlement terminates the purchaser's recoupment rights," but notes that "[t]he recoup-

ment issue ... was not submitted in the case before us." *Hurd Enterprises, Ltd. v. Bruni*, 828 S.W.2d 101 (Tex.App.—San Antonio 1992, writ denied).

repudiation damages still represented non-production. *Id.* at 599.

After the original panel opinion in *Trans-American* issued, subsequent courts addressing the issue approved and adopted the original panel's reasoning. *See, e.g. Williamson v. Elf Aquitaine, Inc.,* 925 F.Supp. 1163, 1169–70 (N.D.Miss.1996)(interlocutory appeal certified to Fifth Circuit, 1996 WL 671660 (N.D.Miss. July 25, 1996)); *Neel v. HECI Exploration Co.,* 1996 WL 426066, at *8–9 (Tex.App.—Austin, July 31, 1996), *withdrawn on rehearing,* 942 S.W.2d 212 (Tex. App.—Austin 1997, n.w.h.)(revising opinion on unrelated grounds and deleting citation to *TransAmerican* ). Most directly on point is the Mississippi district court's decision in *Williamson.* In that case, the pipeline settled with the producer/lessee for a single lump sum payment of $6,578,000.00 in exchange for the lessee's agreement to waive any past claims and to decrease the sales price for any future gas purchases. 925 F.Supp. at 1166. In addition, the pipeline's make-up rights were eliminated. *Id.* In reliance on the panel opinion in *TransAmerican,* the court held that "a court's finding that nonrecoupable settlements are indeed royalty-bearing, based on the fact that production has occurred, is consistent with the Texas court's literal interpretations of the lease language." *Id.* at 1170. The court noted that this interpretation of the lease takes into account "the practical realities of the gas market" and infuses "an examination of the equities of settlements within an interpretation of the lease language itself." *Id.*

Even more compelling than the use made of the original panel opinion as authority in subsequent decisions, however, is the manner in which one court followed this court's *en banc* decision while reaching a result similar to that reached in the original panel opinion and clearly applicable to the case at hand. *See Harvey E. Yates Co. v. Powell,* 98 F.3d 1222 (10th Cir.1996). In *Yates,* a gas lessee and oil and gas trade association brought a declaratory judgment action seeking to invalidate a regulation promulgated by the New Mexico Commissioner of Public Lands (the "Commissioner"). *Id.* at 1226. The Commissioner counterclaimed seeking royalties on certain proceeds received by the gas lessee in settlement of take-or-pay disputes. *Id.*

The Tenth Circuit initially applied the same reasoning asserted in this court's *en banc* decision in *TransAmerican* and held that no royalties were due on the settlement payments under a "production"-type lease until actual physical extraction. *Id.* at 1234–35. This conclusion, however, was only the first of three guiding principles adopted by the Tenth Circuit and did not completely resolve the dispute over the royalties. The third principle adopted by the Tenth Circuit required the payment of royalties on any portion of a settlement payment that is a buy-down of the contract price for gas that is actually produced and taken by the settling producer. *Id.* at 1231. The Tenth Circuit held that such royalties were payable at the time of such production. *Id.* The court reasoned that it could attribute settlement proceeds to production if the settling purchaser took actual production at a reduced price because of the settlement provisions. *Id.*

While the Tenth Circuit's decision is distinguishable from the original panel opinion's decision in *TransAmerican* because in *TransAmerican* the actual production was sold to third parties, and not the settling purchaser, the Tenth Circuit's decision does recognize that a lessee would be granted a windfall if the lessee were permitted to retain the entire settlement payment without ever paying a royalty to the lessee "on the buy-down settlement amount that is used as a partial up-front payment for later gas that is produced and taken at below-contract prices." *Id.* at 1236. Furthermore, the decision also acknowledges that if royalties were never paid, " a lessee would be encouraged to avoid its royalty obligations by accepting large nonrecoupable payments in exchange for reduced prices on future production."

I continue to believe that cogent arguments support a distinction between recoupable and nonrecoupable take-or-pay settlements. *Hurd Enterprises, Ltd. v. Bruni,* 828 S.W.2d at 106 n. 8. I agree with the distinctions drawn between these types of payments by the district court in *Williamson,* 925 F.Supp. at 1168–69. Therefore, I dissent

from the majority's steadfast refusal to recognize the inequities flowing from its holding that royalties are not payable on a nonrecoupable take-or-pay settlement payment because it represents nonproduction.

## 2. Covenant to Market

Although the majority decision is correct in recognizing that an implied covenant to market exists that is enforceable by the assignees, I believe the majority again errs in following *TransAmerican* and holding that the duty to market is not triggered in the absence of production.

The majority relies in part on the holding in *Mandell v. Hamman Oil and Refining Co.*, 822 S.W.2d 153 (Tex.App.—Houston [1st Dist.] 1991, writ denied). In analyzing the decision in *Mandell,* however, the fact that a jury issue was submitted as to whether the implied covenant to market was breached is a critical fact to be considered. 822 S.W.2d at 164. Similarly, in *Bruni,* an issue regarding the alleged breach of the implied covenant to market was submitted and rejected by the jury. *Hurd Enterprises, Ltd. v. Bruni,* 828 S.W.2d at 104 (jury asked whether Hurd failed to reasonably market the gas by (a) agreeing to the two contract amendments and (b) settling the contract claims as it did). Both of these cases lend support for the proposition that the lessee's actions in settling a take-or-pay claim, particularly the manner in which it is structured, raises a question of fact as to whether the implied covenant to market has been breached.

Nevertheless, the unqualified legal pronouncements in both *Mandell* and *Trans-American* that the duty to market is only triggered by production requires a re-examination of the scope of the implied covenant to market in order to determine whether such a covenant can be breached by a lessee's actions in settling a breach of a take-or-pay provision. *See* Randy King, Note, *Royalty Owner Claims to Take–Or–Pay Payments*

*under the Implied Covenant to Market and the Duty of Good Faith and Fair Dealing,* 33 S. TEX. L.REV. 801, 813 (1992)(noting that no decision before *Mandell* had held the implied covenant to be so limited). In analyzing the scope of the implied covenant as it relates to these settlements, it is important to recognize that settlements in this context have been divided into three categories depending upon their structure. First, the term "take-or-pay settlement" is generally used to refer to a compromise of a take-or-pay claim, usually for less than its face amount, "without exchanging the contract provisions." John S. Lowe, *Defining the Royalty Obligation,* 49 SMU L.REV. 223, 226 n. 15 (1996); *see also Independent Petroleum Ass'n of America v. Babbitt,* 1995 WL 431305, at *7 (D.D.C. June 14, 1995), *rev'd,* 92 F.3d 1248 (D.C.Cir.1996). The second category, a "buy-out payment," extinguishes a purchaser's obligation to take volumes in the future by the reformation or termination of the contract. John S. Lowe, *Defining the Royalty Obligation,* 49 SMU L.REV. 223, 226 n. 16 (1996); Randy King, Note, *Royalty Owner Claims to Take–Or–Pay Payments under the Implied Covenant to Market and the Duty of Good Faith and Fair Dealing,* 33 S. TEX. L.REV. 801, 828 (1992); *Babbitt,* 1995 WL 431305, at *7. Finally, a "buy-down" refers to a settlement that reduces the price of future production to the original purchaser under an amended or successor contract. John S. Lowe, *Defining the Royalty Obligation,* 49 SMU L.REV. 223, 226 n. 17 (1996); Randy King, Note, *Royalty Owner Claims to Take–Or–Pay Payments under the Implied Covenant to Market and the Duty of Good Faith and Fair Dealing,* 33 S. TEX. L.REV. 801, 828 (1992); *Babbitt,* 1995 WL 431305, at *7. The structure in the instant case appears to be in the form of a "buy-out" since El Paso was no longer obligated to take any gas under the gas purchase contract after the settlement.[2]

The assertion that the implied covenant to market is only triggered by production ig-

---

**2.** Contrary to this court's opinion in *TransAmerican,* the district court in *Babbitt* approved the reasoning of Assistant Secretary Ada E. Deer in an agency decision affirming an order to pay royalties on a take-or-pay settlement structured as a buyout:

> The parties to a buyout arrangement ... know that subsequent production will be sold at lower prices and that the lessee-producer will not obtain the same price as under the original contract. A lump-sum payment to buy out the obligation to take required volumes at higher prices therefore compensates the lessee

nores an entire line of existing case law. For example, it has been held that where the gas purchase contract dictates the gas price on which royalties are to be paid, the producer has an implied duty to act in good faith in entering into such a contract. *See Le Cuno Oil Co. v. Smith*, 306 S.W.2d 190, 192 (Tex. Civ.App.—Texarkana 1957, writ ref'd n.r.e.), *cert. denied*, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958). Thus, the implied covenant was held to be applicable to the negotiation of the gas purchase contract before production because the contract governed the terms under which the gas would be disposed after production.

In addition, in *El Paso Natural Gas Co. v. American Petrofina Co. of Texas*, 733 S.W.2d 541, 550 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), *cert. denied*, 485 U.S. 987, 108 S.Ct. 1289, 99 L.Ed.2d 499 (1988), the royalty owners contended the implied duty to market was breached by the lessee's actions in applying for and receiving governmental authority to abandon a favorable pricing method for the sale of gas. Although the court held the implied duty was not breached under the facts in that case, the court asserted that the producer does have an implied duty to act in good faith in marketing the gas where the amount of the royalty depends on the price at which the product is marketed. *Id.* The court noted that the duty to market is based on the assumption that the producer is "marketing something that belongs to the royalty owners, and retaining some benefit for itself that should rightfully be included in the benefit obtained for the royalty owners." *Id.* Therefore, this case supports the proposition that the implied covenant to market attaches to the marketing activity whether such activity is undertaken before or after production.

Finally, in *Amoco Production Co. v. First Baptist Church of Pyote*, the producers committed and dedicated the gas from appellees' wells to a long term contract whereunder the price would be one-half of the available market rate for such gas with no provision for future price redetermination. 579 S.W.2d 280, 284 (Tex.Civ.App.—El Paso 1979), *writ ref'd n.r.e.*, 611 S.W.2d 610 (Tex.1980). By approving this new dedication, the producer was able to achieve a substantial price increase for the gas already dedicated, thereby obtaining extra benefits for itself to the detriment of the appellees. *Id.* at 284–286. The court held that this action by the producer was a breach of the implied covenant to market. *Id.* at 287.

The foregoing cases, therefore, hold that the implied covenant to market applies to the negotiation of a gas purchase contract based on the effect such a contract has on the royalty owners by determining the price at which gas that is produced will be sold. Thus, the duty is not limited to the marketing of gas already produced but extends to the negotiation of contractual terms under which future production is to be sold. *See also Davis v. CIG Exploration, Inc.*, 789 F.2d 328, 332 (5th Cir.1986)(lessee breaches implied covenant to reasonably market by failing to obtain terms in gas sales contract that a reasonably prudent operator would have obtained); *Parker v. TXO Production Corp.*, 716 S.W.2d 644, 646–47 (Tex.App.— Corpus Christi 1986, no writ)(contract did not constitute breach of implied covenant to market based on reasons for agreeing to terms thereof). Assuming the producer must comply with the implied covenant in first negotiating the gas purchase contract, it is axiomatic that the same obligation extends to amending the terms of the contract

---

in some degree for the reduced price the lessee will receive when the gas is produced and delivered.

The fact that a substitute purchaser, instead of the original purchaser, is involved in the buyout situation does not change the result.... If bought out volumes are produced and delivered to the substitute purchaser under a successor agreement [or on the spot market], the amount paid by the original purchaser to be relieved of its obligation to take the gas is part of the benefit which the lessee derives from that production. The payment therefore is at-

tributable to those volumes and becomes a part of the total amount paid to the lessee for that production.
1995 WL 431305, at *10–11 (citing Samedan Oil Corp., MMS–94–0003, at 16–17 (Sept. 16, 1994)); *see generally* Carroll Martin & Jane Webre, *Gas Royalty Issues: Who, What, How, and When? Valuation and Payment in Today's Market*, 46TH INST. ON OIL & GAS L. & TAX'N 2–1, 2–24 (1995)(noting that neither the *Bruni* decisions nor *Mandell* address a royalty owner's right to share in a contract "buy-out").

through settlement or otherwise. *See Hurd Enterprises, Ltd. v. Bruni,* 828 S.W.2d at 104 (jury asked whether Hurd failed to reasonably market the gas by (a) agreeing to the two contract amendments and (b) settling the contract claims as it did); *see generally* Steve A. Whitworth, *Royalties on Gas Contract Settlement,* 8TH ANN. ADVANCED OIL, GAS & MIN. LAW COURSE M–1, M–27–31 (State Bar of Texas 1990)(discussing breach through renegotiation of gas purchase contract). The need to protect the royalty owners in both situations would be equally compelling. As one commentator has expressed:

> Claims for a share of take-or-pay, settlements, buy-downs and buy-outs are likely to be another story. The classic and easy application of the implied covenant to market occurs when a lessee exchanges a benefit that the market or a contract would allocate to its lessor for a benefit to itself or to some other lessor. That is precisely what happens in most take-or-pay settlements. Generally, the lessee is given a cash payment in exchange either for a release or a modification of volume or price obligations imposed upon the purchaser by the gas contract. In either event, the lessee is trading off contract terms that benefit both the lessor and the lessee for benefits that go into the lessee's pockets. The lessee's judgment should be subject to scrutiny under the reasonable prudent operator standard, and there is a strong argument that the benefits of the settlement, buy-down or buy-out should be shared proportionately.

3A W.L. SUMMERS, THE LAW OF OIL AND GAS § 589A (John W. Lowe Supp.1995)(endnotes omitted). Therefore, I would hold, as a matter of law, that the implied covenant to market is triggered by the renegotiation of a gas purchase contract because the gas purchase contract determines the price at which gas that is produced will be sold. *See generally* Bruce M. Kramer, *Royalty Obligations Under the Gun—The Effect of Take–or–Pay Clauses on the Duty to Make Royalty Pay-*

*ments,* 39TH INST. ON OIL & GAS L. & TAX'N 5–1, 5–30–5–33 (1988)(recognizing implied covenant may be breached by settlement through amendment of gas purchase contract).

In 1989, pipelines reported paying $8.2 billion to settle contract liability claims valued at $44 billion in order to avoid the less desirable result of forcing the pipeline into bankruptcy. 4 W.L. SUMMERS, THE LAW OF OIL AND GAS § 762 n. 5 (John S. Lowe Supp. 1995). Therefore, as a general proposition, one might contend the failure to undertake settlement in such an environment would not be prudent; however, it is the manner in which the settlement is structured with which we need to be concerned. *See Williamson,* 925 F.Supp. at 1172 (holding implied covenant breached by failure to share economic benefits of settlement with royalty owners). As one court has noted:

> Unquestionably, lessors' interests are best served by facilitating settlement agreements instead of shutting in gas wells or forcing pipelines into bankruptcy. Still, inequity can result if a lessee re-negotiates terms with its pipeline customer that are of unilateral benefit and exclude the lessor. When a lessee fails to obtain the highest available price for the lessor's gas supply, or behaves strategically in favoring itself over a royalty owner's legitimate interest, there may be a breach of two implied covenants—first, to reasonably market the gas; second, to obtain terms in the sales contract that a reasonably prudent operator would have obtained. *See, e.g., Davis v. CIG Exploration, Inc.,* 789 F.2d 328, 332 (5th Cir.1986). A breach of either covenant ought to be compensable.

1995 WL 431305, at *11–12.[3]

Under the implied covenant to market, the lessee/producer is required to comply with the reasonably prudent operator standard, and whether a lessee's actions comply with this standard is a question of fact. *See Amoco Production Co. v. First Baptist Church of Pyote,* 579 S.W.2d at 284; *see generally* Walter Cardwell, *Do Producers Owe Royalty on*

---

**3.** The district court in *Babbitt* also addressed the risk allocation argument relied on by the courts to support the nonpayment of royalties on take-or-pay settlements:

> Finally, a word about risk allocation. The Fifth Circuit justified, in part, their holding in

*Diamond Shamrock* by observing that the lessor does not "shoulder the associated risks of exploration, production and development...." The lessee is the exclusive bearer of these risks. [*Diamond Shamrock Exploration Co. v. Hodel,*] 853 F.2d [1159] at 1167 [(5th Cir.1988)]. This

*Take–or–Pay Settlements,* 9TH ANN. AD-VANCED OIL, GAS & MIN. L. COURSE S–1, S–11 (State Bar of Texas 1991). Focusing on the contractual amendments, it is arguable that each of the terms that were amended origi-nally benefitted the royalty owners, i.e., the price was greater before the amendment, El Paso was required to take specific quantities of gas at the higher prices and the term of the contract was shorter. In fact, appellees expressly admitted that the royalty owners would benefit from maintaining the original contractual provisions.[4] Therefore, the evi-dence raises a factual issue as to whether a reasonably prudent operator cognizant of the best interests of the royalty owners would have structured a settlement in the manner consented to by the appellees. For this rea-son, I would reverse the trial court's judg-ment and remand this issue to the trial court for factual determination.

Heralio Flores, Marcos Antonio Flores, Rio Grande, pro se.

G. Allen Ramirez, Rio Grande, O.C. Hamil-ton, Jr., Lisa Powell, Atlas & Hall, L.L.P., McAllen, David L. Garza, Rio Grande City, for Appellees.

statement is only intelligible if risk is equated with out-of-pocket expenditure. Surely the les-sor receives diminished royalties if exploration, production and development projections are not met. Furthermore, mineral exploitation by the lessee of the lessor's land involves opportu-nity costs borne exclusively by the lessor. These opportunity costs include foregone prof-its from alternative uses of the land, including other royalty arrangements that might have been negotiated. 1995 WL 431305, at *12.

4. Appellees' letter to the lessors/royalty owners dated January of 1987 concluded: "If the leases covering these wells remain committed to the gas contract with El Paso, royalty and working inter-est owners who are affected by this gas contract stand to benefit." In addition, in the stipulated record before the trial court, one of appellees' representatives also admitted during his deposi-tion that the working interest owners and royalty owners would have benefitted from maintaining the contract with El Paso and not modifying it as it existed at that time.